FILED

2020 Jun-17  PM 12:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LINDA EVANS,                )
                           )
       Plaintiff      )
                           )
   vs.                )   Case No.  2:19-cv-01237-HNJ
                           )
COMMISSIONER, SOCIAL SECURITY   )
ADMINISTRATION,       )
                           )
       Defendant   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Evans seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for supplemental security income.  The undersigned carefully considered the record, and for the reasons expressed herein, the court **REVERSES** the Commissioner's decision and **REMANDS** for further consideration of the medical opinion evidence and Evans's subjective complaints of pain.[1]

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  20 C.F.R. § 416.905(a).  To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process.  *See* 20 C.F.R. § 416.920(a)(4).  The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far.  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.  20 C.F.R. § 416.920(b).  Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ."  *Id.* at § 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00–114.02. *Id.* at § 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. § 416.920(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 416.920(a)(4)(v); *see also* 20 C.F.R. § 416.920(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 446.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "decision with deference to the factual findings and close scrutiny of the legal conclusions." *Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial

evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Evans, age 53 at the time of the ALJ hearing, protectively filed an application for supplemental security income on July 28, 2016, alleging disability as of August 1, 2008.[2]  (Tr. 232–37).  The Commissioner denied her claim, and Evans timely filed a request for a hearing.  (Tr. 157–64).  The Administrative Law Judge ("ALJ") held a hearing on July 12, 2018, during which Evans amended her alleged onset date to July 28, 2016.  (Tr. 30–72, 35).  The ALJ issued an opinion denying Evans's claim on October 10, 2018.  (Tr. 15–24).

Applying the five-step sequential process, the ALJ found at step one that Evans had not engaged in substantial gainful activity since July 28, 2016, her alleged onset and application date.  (Tr. 17).  At step two, the ALJ found Evans had the severe impairments of obesity, osteoarthritis of the bilateral shoulders, fibromyalgia, and left hip bursitis.[3]  (Tr. 17–18).  At step three, the ALJ found that Evans's impairments, or

---

[2] Evans previously applied for supplemental security income and disability insurance benefits on May 3, 2013.  (Tr. 108).  The Commissioner denied Evans's applications on October 30, 2014.  (Tr. 108–18).

[3] Bursitis refers to "a painful condition that affects the small, fluid-filled sacs. . . that cushion the bones, tendons and muscles near [one's] joints."  https://www.mayoclinic.org/diseases-conditions/bursitis/symptoms-causes/syc-20353242 (last visited June 8, 2020).  "Pain, swelling, and tenderness near a joint are the most common signs of bursitis." https://www.hopkinsmedicine.org/health/conditions-and-diseases/bursitis#:~:text=The%20major%20bursae%20(this%20is,generally%20does%20not%20cause%20deformity. (last visited June 8, 2020).  Bursitis and fibromyalgia "are sometimes seen

combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19).

Next, the ALJ found that Evans exhibited the residual functional capacity ("RFC") to perform light work, except that she could occasionally stoop; crouch; reach overhead with her bilateral upper extremities; and climb ramps and stairs.  She could never kneel or crawl, or climb ladders, ropes, or scaffolds.  In addition, she could sustain occasional exposure to extremes of cold and heat; though, she should never be exposed to hazards such as unprotected heights and dangerous machinery.  Furthermore, she should perform all work inside with no exposure to direct sunlight.  Finally, she would need to alternate from standing to sitting every hour for one to three minutes, but she would remain on task.  (Tr. 19).

At step four, the ALJ determined that Evans did not retain the ability to perform her past relevant work as a hotel inspector.  (Tr. 22).[4]  At step five, the ALJ determined that, considering Evans's age, education, work experience, and RFC, a significant number of other jobs exist in the national economy that she could perform.  (Tr. 23–

---

concomitantly."                          https://www.news-medical.net/health/Fibromyalgia-with-Bursitis.aspx#:~:text=Fibromyalgia%20is%20a%20condition%20that,be%20confused%20for%20one%20another. (last visited June 8, 2020).

[4] In addition to "hotel inspector", the VE (Vocational Expert) testified that Evans's past relevant work includes "housekeeper."  (Tr. 67).  The ALJ's decision does not discuss the VE's testimony that Evans's past relevant work includes housekeeping, and does not address whether Evans retains the RFC to work as a housekeeper.

24).   Accordingly, the ALJ determined that Evans has not suffered a disability, as defined by the Social Security Act, since July 28, 2016.  (Tr. 24).

Evans timely requested review of the ALJ's decision.  (Tr. 218).  On May 30, 2019, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1–3).  On August 2, 2019, Evans filed her complaint with the court seeking review of the ALJ's decision.  (Doc. 1).

## ANALYSIS

In this appeal, Evans argues substantial evidence does not support the ALJ's decision.  Specifically, Evans avers the ALJ (1) failed to properly assess the medical opinion evidence regarding her fibromyalgia; and (2) improperly discredited her subjective complaints of pain and lay witness testimony regarding her fibromyalgia. For the reasons discussed herein, the court agrees.

### I.     The ALJ Failed to Properly Assess the Medical Opinion Evidence

Evans contends the ALJ erred by according little weight to the opinions of her treating physician, Dr. Ramy J. Toma of the Simon-Williamson Clinic, vis-à-vis her fibromyalgia.   According to Evans, the medical evidence of record buttresses Dr. Toma's opinions regarding the severity of her fibromyalgia, and the ALJ improperly "require[ed] additional 'objective' findings to substantiate Dr. Toma's opinions." (Doc. 10 at 5).  Relatedly, Evans avers the ALJ erred by according great weight to the opinions of state agency consultant Dr. Robert H. Heilpern.  The court will discuss the ALJ's evaluation of Dr. Toma's and Dr. Heilpern's opinions in turn.

### A.    The ALJ Failed to Properly Weigh Dr. Toma's Opinion

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436 1440 (11th Cir. 1997)). Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.* An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions. *Id.* An ALJ does not commit reversible error when (1) she articulates specific reasons for declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curiam).

It remains settled in the Eleventh Circuit that "a lack of objective evidence" constitutes the "hallmark" of fibromyalgia. *Moore*, 405 F.3d at 1211 (11th Cir. 2005); *accord Horowitz v. Comm'r of Soc. Sec.*, 688 F. App'x. 855, 863 (11th Cir. 2017) (per curiam); *Brown-Gaudet-Evans v. Comm'r of Soc. Sec.*, 673 F. App'x. 902, 906 (11th Cir. 2016) (per curiam); *Hernandez v. Comm'r of Soc. Sec.*, 523 F. App'x. 655, 657 (11th Cir. 2013) (per curiam); *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x. 56, 63 (11th Cir. 2010) (per curiam). Fibromyalgia "often lacks medical or laboratory signs, and is generally diagnosed mostly

on a[n] individual's described symptoms."[5] *Moore*, 405 F.3d at 1211.  Thus, "a claimant's subjective complaints of pain are often the only means of determining the severity of a patient's condition and the functional limitations caused thereby[,] . . . 'render[ing] . . . over-emphasis upon objective findings inappropriate.'" *Somogy*, 366 F. App'x at 64 (fourth alteration in original) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (11th Cir. 2007)).  Accordingly, "a treating physician's determination that a patient is disabled due to fibromyalgia is even more valuable because there are no objective signs of severity."  *Stewart v. Apfel*, No. 99-6132, 2000 U.S. App. LEXIS 33214, at *9 (11th Cir. Dec. 20, 2000).

In the instant case, Dr. Toma opined, in relevant part:

Ms. Linda Evans is a patient of mine with several chronic medical conditions, including:  Lupus, osteoarthritis, Fibromyalgia, lumbar degenerative disk disease, carpal tunnel syndrome, obstructive sleep apnea, Restless leg syndrome, and iron anemia.  Due to her conditions,

---

[5] As recognized in *Stewart v. Apfel*, No. 99-6132, 2000 U.S. App. LEXIS 33214 (11th Cir. Dec. 20, 2000):

The American College of Rheumatology has described fibromyalgia as:

'[A] syndrome [that] is a common form of generalized muscular pain and fatigue.  The name "fibromyalgia" means pain in the muscles and the fibrous connective tissues (the ligaments and tendons). . . . Fibromyalgia is especially confusing and often misunderstood because almost all its symptoms are also common in other conditions. In addition, it does not have a known cause . . . .Unfortunately, because certain syndromes lack physical and laboratory findings (signs), but depend mostly on a person's report of complaints and feelings (symptoms), these syndromes are often viewed as not being real or important.'

*Stewart*, 2000 U.S. App. LEXIS 33214, at *7–8 (quoting Arthritis Foundation & American College of Rheumatology, *Arthritis Information: Fibromyalgia* (1992)).

she requires several medications, and sees different specialists for her conditions.  She is scheduled to see her Rheumatologist every 3 months with labwork to monitor her illnesses and organ function.  Due to her conditions, she has chronic musculoskeletal pain and weakness, and she requires asssitance [sic] with her activities of basic living.  She also has been unable to drive since 2013 due to her medical conditions.

Tr. 672.[6]

The ALJ accorded Dr. Toma's opinions little weight.[7]  According to the ALJ,

Dr. Toma's opinions remain "[un]supported by any objective evidence in his treatment

---

[6] Dr. Toma's opinion remains undated.

[7] The court notes that the ALJ cited two "opinions" by Dr. Toma in addition to the afore-quoted, undated opinion.  The ALJ's first citation corresponds to a March 2, 2016, letter in which Dr. Toma stated:  "Ms. Linda Evans is a patient of mine with several chronic medical conditions, including: Lupus, osteoarthritis, Fibromyalgia, obstructive sleep apnea, Restless leg syndrome, and iron anemia. Due to her conditions, she requires several medications, and sees different specialists for her conditions."  (Tr. 390).  This letter duplicates the first two statements in the afore-quoted, undated opinion, and thus remains superfluous.  Accordingly, the court will not assess Dr. Toma's March 2, 2016, letter as a treating physician's opinion.

The second citation corresponds to a July 24, 2017, letter, in which Dr. Toma stated:  "LINDA EVANS is currently under my medical care and may not return to work at this time.  Please excuse MIKE EVANS for 1 day[.]  He may return to work on 07/25/2017."  (Tr. 639).  The court does not heed this letter as an opinion, but rather as a form excuse letter.  Mike Evans constitutes Evans's spouse, (tr. 50), and, given his reference in the letter, presumably did not attend work on July 24, 2017, to accompany Evans to her appointment with Dr. Toma that day.  Moreover, Evans ceased working in 2008, (tr. 41), five years prior to establishing treatment with Dr. Toma.  (Tr. 445) (Evans presented to Simon-Williamson on October 18, 2013, "for establishment" with Dr. Toma).  Accordingly, despite Dr. Toma stating Evans "may not return to work at this time", the court does not construe his July 24, 2017, letter, as a treating physician's opinion.  In any event, to the extent Dr. Toma's letter constitutes an opinion that Evans lacks the ability to work, it sustains no dispositive weight.  *See Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x. 833, 834 (11th Cir. 2017) ("According to 20 C.F.R. § 404.1527(d), the determination of whether an individual is disabled is reserved to the Commissioner, and no special significance will be given to an opinion on issues reserved to the Commissioner. Section (d)(2) provides that although the Commissioner will consider opinions from medical sources on issues such as the RFC and the application of vocational factors, the final responsibility for deciding those issues is reserved to the Commissioner."); *Robinson v. Astrue*, 365 F. App'x. 993, 999 (11th Cir. 2010) ("[T]he task of determining a claimant's . . . ability to work is within the province of the ALJ, not of doctors.").

records and are not consistent with the totality of the other evidence." (Tr. 22). The ALJ maintained that Dr. Toma's opinion that Evans required assistance with her daily living activities "is not supported by any objective evidence in the medical evidence of record." (*Id.*) Further, the ALJ noted, "Dr. Toma's treatment notations generally indicate that [Evans] was doing well. Some of his treatment records document multiple tender points. However, [Evans] generally had 5/5 muscle strength and full range of motion of her extremities, including her hip." (*Id.*) (internal citation omitted). The ALJ's assessment does not rest upon substantial evidence.

At the outset, the court discerns a critical ambiguity in the ALJ's discussion of Dr. Toma's opinion. The ALJ twice observed that objective evidence fails to support Dr. Toma's opinion. However, as elaborated previously, a lack of objective evidence constitutes fibromyalgia's hallmark, rendering an ALJ's over-emphasis thereupon improper. *See Moore*, 405 F.3d at 1211; *Somogy*, 366 F. App'x at 64. Here, nevertheless, the ALJ found that Evans's severe impairments also include obesity, osteoarthritis of the bilateral shoulders, and left hip bursitis – impairments which may engender objective evidence. Indeed, a claimant *must* present objective evidence of these impairments to establish a disability. *See Hennes v. Comm'r of Soc. Sec.*, 130 F. App'x 343, 348 (11th Cir. 2005) (substantial evidence supported the ALJ's decision to deny benefits because the claimant failed to present objective evidence that his obesity reasonably caused her alleged pain); *Blankenship v. Soc. Sec. Admin.*, No. 6:18-cv-01827-SGC, 2020 U.S. Dist. LEXIS 63980, at *17 (N.D. Ala. Apr. 13, 2020) (the ALJ properly discounted

a treating physician's opinion based upon a lack of objective evidence of the claimant's osteoarthritis); *Jones v. Berryhill*, No. 2:15-cv-167, 2017 U.S. Dist. LEXIS 83080, at *11 (S.D. Ga. May 31, 2017) (the ALJ's RFC formulation rested upon substantial evidence because the objective evidence failed to portray that the claimant's right hip bursitis caused greater limitations than those the ALJ ascertained).

The ALJ did not articulate whether she discredited Dr. Toma's opinion based upon the purported lack of objective evidence regarding Evans's fibromyalgia, left hip bursitis, or osteoarthritis of the bilateral shoulders. This distinction bears significance because, of course, any lack of objective evidence vis-à-vis Evans's left hip bursitis and osteoarthritis may constitute a valid basis for discrediting Dr. Toma's opinion.[8] Contrariwise, any lack of objective evidence of Evans's fibromyalgia cannot constitute good cause to discredit Dr. Toma's opinion. Thus, to the extent the ALJ relied upon a lack of objective evidence of Evans's fibromyalgia to discount Dr. Toma's opinion, the ALJ improperly failed to observe the "the fact that fibromyalgia by its very nature lacks objective evidence." *Stewart*, 2000 U.S. App. LEXIS 33214, at *9 n.4; *see Somogy*, 366 F. App'x at 64 ("The lack of objective clinical findings is, at least in the case of fibromyalgia, therefore insufficient alone to support an ALJ's rejection of a treating physician's opinion as to the claimant's functional limitations.").

---

[8] As elaborated in the following discussion, however, the court discerns that the record *does* contain objective evidence of these impairments.

Despite this ambiguity, however, the ALJ's final remarks regarding Dr. Toma's opinion suggest she confused the evidence relevant to Evans's fibromyalgia with the evidence pertaining to her other impairments.  The ALJ concluded:  "Some of [Dr. Toma's] treatment records document multiple tender points.  However, [Evans] generally had 5/5 muscle strength and full range of motion of her extremities, including her hip."  (Tr. 22).

By beginning the second sentence with "however", the ALJ juxtaposes Evans's multiple tender points with her muscle strength and range of motion, thus, delineating that the latter contradicts or undermines the former.  But crucially, while the presence of tender points constitutes a "paradigmatic symptom[]" of fibromyalgia, *Harrison v. Comm'r of Soc. Sec.*, 569 F. App'x 874, 877 (11th Cir. 2014), "fibromyalgia patients 'manifest normal muscle strength and neurological reactions[,] and have a full range of motion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007) (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (1988)); *see also Moore*, 405 F.3d at 1211; *Steiner v. Berryhill*, No. 16-cv-1280-JPG-CJP, 2017 U.S. Dist. LEXIS 138142, at *24 (S.D. Ill. Aug. 28, 2017) ("Fibromyalgia is characterized by widespread pain and not a decreased range of motion.").  Accordingly, Evans's muscle strength and range of motion bear no relevance to her fibromyalgia and associated tender points.  And if, as the court surmises, the ALJ did not perceive the particularities of fibromyalgia – namely, its lack of objective evidence and distinguishing symptoms – the court cannot conclude her assessment rests upon substantial evidence.  *See Woods v. Berryhill*, No. 15-81277-

CIV-HOPKINS, 2017 U.S. Dist. LEXIS 50699 at *9–21 (S.D. Fla. Mar. 30, 2017) (the case warranted remand because the ALJ improperly discredited the treating physician's opinion vis-à-vis the claimant's fibromyalgia based upon irrelevant evidence and a lack of objective findings); *Burroughs v. Massanari*, 156 F. Supp. 2d 1350, 1366 (N.D. Ga. 2001) ("Apart from muscle and soft tissue pain, both of which are "defining symptoms" of [fibromyalgia], 'the most common symptoms, present in more than two-thirds of patients, are undue fatigue, trouble sleeping (insomnia), and joint pains.  Slightly less frequent but present in half or more of patients are recurrent headaches, jerky leg movements ("restless leg"), and numbness and tingling in various parts of the body.' . . . Given this description of the disease, the undersigned is unable to discern any relevance to the ALJ's finding that plaintiff did not suffer from joint swelling.") (internal citations omitted) (citing 6 Roscoe N. Gray & Louise J. Gordy, Attorneys' Textbook of Medicine, 25.01, 25.35 (3d ed. 2000)).

Even assuming the ALJ did not conflate Evans's fibromyalgia and other impairments, the record belies the ALJ's assertion that Dr. Toma's opinions are "not supported by *any* objective evidence in his treatment records" and do not accord "with the totality of the other evidence."  (Tr. 22) (emphasis added).  To recount, Dr. Toma opined that Evans suffers "chronic musculoskeletal pain and weakness, and . . . requires asssitance [sic] with her activities of basic living."  (Tr. 672).  Contrary to the ALJ's

statement, Dr. Toma's opinions find support in his own treatment records and in the other medical evidence of record.[9]

As for Dr. Toma's opinion that Evans suffers from chronic musculoskeletal pain, supporting evidence abounds.  To be sure, the ALJ correctly observed that Dr. Toma's treatment notes periodically indicate that Evans "was doing well," or contain similar positive remarks.[10]   (Tr. 94, 406, 415, 437, 442).   Notwithstanding these records, however, Dr. Toma consistently documented[11] and treated Evans's pain.

In March 2016 – three months before Evans's alleged onset date – Dr. Toma noted that Evans complained of "recurrent [left] hip pains and stiffness", and reported it was "constant[ly] painful to walk or lie on [her left] side."  (Tr. 608).  Dr. Toma

---

[9] The record contains limited evidence that Evans suffers from weakness.  During a May 2018 appointment with Dr. Toma, Evans reported that her "[l]eft leg gives out at times."  (Tr. 86).  However, Evans denied experiencing weakness at her October 2014, March 2016, and July 2017 appointments with Dr. Toma.  (Tr. 405, 437, 635).  In addition, Evans exhibited normal muscle strength during her March 2014 appointment with Dr. Toma, (tr. 440), and during her October 2016 evaluation with Dr. Parish.  (Tr. 458).  Evans reported experiencing "weakness and giving way" during her May 2017 evaluation by Dr. Featheringill; however, her right shoulder exhibited "good external rotation and abduction strength", and her left hip exhibited "good . . . abduction and flexion power." (Tr. 675–76).  Accordingly, the ALJ possessed good cause to discount Dr. Toma's opinion that Evans suffers from weakness.

[10] To support her observation, however, the ALJ incorrectly cited to a record bearing the name of Dr. Ashima Malik, who also treated Evans at the Simon-Williamson Clinic.  (Tr. 495).  Nevertheless, Dr. Malik indicated in this record that Evans's "overall pain [is] doing ok", (*id.*), and noted similar positive remarks in various other records.  (Tr. 412, 423, 495, 640).

[11] Again, Evans's subjective complaints of pain constitute a valid "means of determining the severity of a [her] [fibromyalgia] and the functional limitations caused thereby."  *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x. 56, 64 (11th Cir. 2010 (per curiam).

15

observed tenderness in Evans's left hip and administered her an anti-inflammatory hip injection.  (Tr. 609–10).[12]  He also increased Evans's muscle relaxer dosage.  (Tr. 610).

In January 2017, Dr. Toma administered Evans another anti-inflammatory hip injection and assessed her with chronic trochanteric bursitis of the left hip,[13] chronic left shoulder pain, chronic radiculopathy of the lumbosacral region,[14] and "[o]ther chronic pain."  (Tr. 628).  Dr. Toma referred her to an orthopedist for her chronic left shoulder pain, and prescribed her various pain medications.  (Tr. 628–29).  Similarly, in July 2017, Dr. Toma noted that Evans "continues to have left hip and shoulder pain that is chronic."  (Tr. 634).  Dr. Toma administered Evans an anti-inflammatory hip injection and prescribed her an additional medication to treat her fibromyalgia.  (Tr. 636–37).  Finally, in May 2018, Dr. Toma observed that Evans's abdomen exhibited tenderness.  (Tr. 94).

---

[12] Dr. Toma also recorded Evans's complaints of "chronic insomnia", (tr. 609), which constitutes a symptom of fibromyalgia.  *See Burroughs v. Massanari*, 156 F. Supp. 2d 1350, 1366 (N.D. Ga. 2001) ("Apart from muscle and soft tissue pain, both of which are 'defining symptoms' of the [fibromyalgia], 'the most common symptoms, present in more than two-thirds of patients, are undue fatigue, trouble sleeping (insomnia), and joint pains.'") (citing 6 Roscoe N. Gray & Louise J. Gordy, Attorneys' Textbook of Medicine, 25.01, 25.35 (3d ed. 2000)).

[13] Trochanteric bursitis refers to "hip pain caused by inflammation of the fluid-filled sac, or bursa, on the outer edge of [the] hip."  "The main symptom of trochanteric bursitis is pain in the outer part of the hip. [One] may feel soreness [upon] press[ing] on the outside of [the] hip or l[ying] on that side." https://www.healthline.com/health/trochanteric-bursitis#symptoms (last visited June 9, 2020).

[14] Lumbosacral radiculopathy refers to "a pain syndrome caused by compression or irritation of nerve roots in the lower back."  https://www.ncbi.nlm.nih.gov/books/NBK430837/ (last visited June 15, 2020).

The foregoing records portray that Dr. Toma consistently assessed and treated Evans for her hip, shoulder, and fibromyalgia-related pain.  Accordingly, substantial evidence fails to buttress the ALJ's assertion that Dr. Toma's opinion vis-à-vis Evans's chronic musculoskeletal pain lacks any evidentiary support in his treatment records.  *See Somogy*, 366 F. App'x at 64 ("[T]he record shows that [the claimant] consistently reported symptoms of fibromyalgia, . . . and that [her] physicians consistently noted and credited these complaints."); *Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1187 (N.D. Ala. 2006) ("Objective, clinical support for a diagnosis of fibromyalgia may . . . be present if injections of pain medication to the trigger points are prescribed.") (citing *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Rutledge v. Barnhart*, 391 F. Supp. 2d 1057, 1062 (N.D. Ala. 2005) ("In spite of its elusive nature, the presence of fibromyalgia can be objectively verified in some cases.  As noted in *Sarchet*, identifiable tender areas or 'trigger points' are well defined and cause pain upon palpation. Objective, clinical support for a diagnosis of fibromyalgia may also be present if injections of pain medication to the trigger points are prescribed.") (citing *Kelley*, 133 F.3d at 598; *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996)); SSR 16-3p, 2016 WL 1237954, at *8 (Mar. 16, 2016) ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.").

Likewise, the remaining medical evidence of record undermines the ALJ's assertion that Dr. Toma's opinion regarding Evans's pain does not accord "with the totality of the other evidence." (Tr. 22). Dr. Malik, for example, routinely documented and treated Evans's pain – despite the aforenoted positive remarks appearing in some of her records.

In January 2015, Dr. Malik noted that Evans was "hurting all over." (Tr. 431). Evans scored her pain level at 10/10 and reported that it "lasts all day." (*Id.*) Dr. Malik observed "[b]one/joint symptoms, [and] [m]yalgia", as well as "multiple tender points present all over consistent w[ith] [fibromyalgia]." (Tr. 433). She also prescribed Evans a pain medication and muscle relaxer. (Tr. 429). At a May 2015 follow-up appointment, Evans scored her pain level at 8/10 and Dr. Malik administered her an anti-inflammatory hip injection. (Tr. 420–21). Furthermore, in July 2015, Dr. Malik noted that Evans's left hip pain remained "out of proportion . . . to other tender points." (Tr. 412). Dr. Malik administered Evans an anti-inflammatory hip injection and prescribed her a muscle relaxer. (*Id.*)

Similarly, in May 2017, Dr. Malik indicated that Evans exhibited "multiple diffuse tender points present all over, [and] significantly worsening tenderness over her left [hip]." (Tr. 640). Dr. Malik advised Evans to continue taking her pain medication and muscle relaxer. (Tr. 461). Likewise, in February 2018, Dr. Malik indicated that Evans exhibited "[b]one/[j]oint symptoms" and "multiple diffuse tender points present all over." (Tr. 496–97). Again, Dr. Malik advised Evans to continue taking her pain

medication and muscle relaxer.  (Tr. 496).  Dr. Malik's records depict that she routinely assessed and treated Evans's pain, and thus, they buttress Dr. Toma's opinion that Evans suffers from chronic musculoskeletal pain.  *See Somogy*, 366 F. App'x at 64; *Reliford*, 444 F. Supp. 2d at 1187; *Rutledge*, 391 F. Supp. 2d at 1062.

Dr. Parish's and Dr. Featheringill's evaluations likewise support Dr. Toma's opinion.  Dr. Parish observed the presence of tenderness or trigger points at various locations on Evans's hands, back, knees, left hip, and shoulders.   (Tr. 461–62).  Furthermore, Evans's elevation and abduction of both shoulders measured only ninety degrees.[15]  (Tr. 460, 462).  Dr. Parish diagnosed Evans, in relevant part, with chronic upper, mid, and lower back pain with possible degenerative joint disease and fibromyalgia; chronic left hip pain with possible degenerative joint disease; chronic bilateral knee pain with possible degenerative joint disease; chronic bilateral shoulder pain with possible degenerative joint disease, probable supraspinatus tendonitis, and possible anterior/posterior rotator cuff dysfunction; and "[t]otal body fibromyalgia." (Tr. 463).

Similarly, Dr. Featheringill discerned that Evans's right shoulder exhibited "limited motion in all planes" and "diffuse tenderness", despite "seem[ing] to have good external rotation and abduction strength."  (Tr. 676).  He also observed that Evans "has

---

[15] A normal shoulder elevation and abduction achieves 150 degrees.  (Tr. 460, 462).  Aside from pain, "a loss of range of motion in the shoulder" constitutes a symptom of shoulder arthritis. https://www.hopkinsmedicine.org/health/conditions-and-diseases/shoulder-arthritis  (last  visited June 9, 2020).

better motion in the left shoulder[,] but it is still limited." (*Id.*)  In addition, although Evans's left hip manifested normal, painless rotational movement, and "good . . . abduction and flexion power", she nonetheless exhibited "point tenderness over the area of the trochanteric bursa." (*Id.*)  Dr. Featheringill diagnosed Evans with bursitis of her shoulders and left hip.  (Tr. 677).  Based upon Dr. Parish's and Dr. Featheringill's findings, the ALJ erroneously concluded that the record lacks any evidence supporting Dr. Toma's opinion that Evans suffers from chronic musculoskeletal pain – whether arising from her fibromyalgia, left hip bursitis, or osteoarthritis of the shoulders.

In sum, the record contains considerable evidence regarding Evans's musculoskeletal pain.  Consistent with Evans's fibromyalgia and left hip bursitis, Dr. Toma and Dr. Malik routinely recorded Evans's complaints of pain, observed the presence of tender points, prescribed her pain medication, and administered her anti-inflammatory hip injections.  Likewise, consistent with her osteoarthritis of the shoulders, Evans's shoulders exhibited a reduced range of motion upon examination by Dr. Parish and Dr. Featheringill.  Dr. Parish and Dr. Featheringill also located tender points along Evans's left hip, and Dr. Parish observed tender points on her shoulders.  Substantial evidence thus fails to support the ALJ's assertion that Dr. Toma's opinion as to Evans's pain lacks any evidentiary support.

Finally, contrary to the ALJ's assertion, the record contains objective evidence supporting Dr. Toma's opinion that Evans requires assistance with daily living activities.

Dr. Parish indicated in his October 2016 evaluation that Evans could dress, cook, and maneuver slip-on shoes.  (Tr. 455).  However, he noted that Evans brushed her teeth "with difficulty due to nerve pain on [her] head"; and she used the toilet "with difficulty due to back pain[,] [and] muscle spasms in her [right] arm . . . [and] chest."  (*Id.*)

Moreover, and significantly, Dr. Parish indicated that Evans could not bathe or shower, button clothes, lace shoes, wash dishes, lift pots and pans, lift greater than five pounds, vacuum, sweep, mop, perform yard work, push or ride a lawn mower, drive, or buy groceries "due to back pain[,] [and] muscle spasms in her [right] arm . . . [and] chest."  (*Id.*)  Similarly, Dr. Parish indicated that Evans can use her dominate hand only with "difficulty" to sign her name, open doors, lift books, pick up coins, maneuver paper clips, and hold cups.  (Tr. 461).  In addition, Dr. Parish noted that Evans "receives assistance performing physical tasks from[] [her] nephew/nephew's wife."  (*Id.*)  Dr. Parish's notations bolster Dr. Toma's opinion that Evans requires assistance with her daily living activities, and thus undermine the ALJ's assessment thereof.  *See Moreno v. Berryhill*, No. 16-CV-61550-DPG, 2017 U.S. Dist. LEXIS 189050, at *14 (S.D. Fla. July 17, 2017) (The ALJ properly discounted a treating physician's opinion based upon a consultative physician's "determin[ation] that [the claimant] was independent in activities of daily living[;] . . . she independently took her medication, paid bills, worked on the weekends, took care of her nephew, took public transportation, and used the computer.").

Based upon the foregoing discussion, the ALJ erroneously asserted that the record lacks *any* evidence supporting Dr. Toma's opinions vis-à-vis Evans's chronic musculoskeletal pain and need for living assistance. Furthermore, the ALJ's discussion of Dr. Toma's opinion portrays a possible misunderstanding of fibromyalgia and the evidence relevant to its assessment. The ALJ thus failed to articulate good cause to discredit Dr. Toma's opinion, particularly as "a treating physician's determination that a patient is disabled due to fibromyalgia is even more valuable because there are no objective signs of severity." *Stewart v. Apfel*, 2000 U.S. App. LEXIS 33214, at *9. Therefore, Evans's case warrants remand to permit the ALJ to reweigh Dr. Toma's opinion.

## B. The ALJ Failed to Properly Weigh the Non-Examining Physician's Opinion

Social Security regulations provide that the opinions of state agency physicians are entitled to substantial consideration. *See* 20 C.F.R. §§ 404.1527(e), 404.1513a(b)(1) (stating that, while the ALJ is not bound by the findings of a state agency physician, the ALJ should consider such a reviewing physician to be both "highly qualified" and an "expert" in Social Security disability evaluation). Nevertheless, the opinions or findings of a non-examining physician are generally entitled to little weight when they contradict the opinions or findings of a treating or examining physician, and "standing alone do not constitute substantial evidence." *Putman v. Soc. Sec. Admin., Comm'r*, 705 F. App'x 929, 932 (11th Cir. 2017) (quoting *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).

22

To determine the weight given to a medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional. 20 C.F.R. §404.1527(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ will give more weight to the medical opinions of a source who has examined the plaintiff and opinions that are supported by medical signs and findings and are consistent with the overall "record as a whole"). The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

In the instant case, state agency physician Dr. Robert H. Heilpern[16] opined on October 28, 2016, that Evans retained the RFC to perform her past relevant work as a housekeeper. (Tr. 150). The ALJ accorded great weight to Dr. Heilpern's opinion that

---

[16] The relevant portion of Evans's brief does not explicitly reference Dr. Heilpern's opinion, but rather that of state agency physician Dr. Richard Whitney. (Doc. 10 at 7) ("Reliance on the non-examining consultant was particularly misplaced here. That consultant, pediatrician Richard Whitney, M.D., reviewed the file on October 26, 2016 . . . ."). However, the ALJ's opinion does not reference or cite to Dr. Whitney's opinion. Nevertheless, Dr. Whitney and Dr. Heilpern reviewed the same evidence, excepting Dr. Parish's October 24, 2016, evaluation – which Dr. Heilpern, but not Dr. Whitney, analyzed – and rendered identical opinions. *Compare* Tr. 130–37 *with* Tr. 142–151. Accordingly, the court presumes Evans mistakenly referenced Dr. Whitney's opinion instead of Dr. Heilpern's.

In addition, the court notes the ALJ accorded "only some weight" to Dr. Timothy Parish's examination of Evans, (tr. 21), though Evans does not raise any issue therewith. Accordingly, the court will not assess the ALJ's weighing of Dr. Parish's opinion.

Evans "could perform a reduce[d] range of light exertion work," stating that Dr. Heilpern's opinion accords "with the totality of the medical evidence of record, including the limited treatment that the claimant has received for her conditions since the date of alleged onset of disability." (Tr. 21). Substantial evidence fails to support the ALJ's assessment of Dr. Heilpern's opinion.

As a preliminary matter, Dr. Heilpern did not explicitly opine that Evans "could perform a reduce[d] range of light work", but rather that she retained the RFC to perform her past relevant work despite "limitations in the performance of certain work activities." (Tr. 150). However, the housekeeper occupation – which represents the occupation Dr. Heilpern assessed – constitutes light work, *see* Dictionary of Occupational Titles 323.687-014, and Dr. Heilpern opined that Evans has exertional, postural, and environmental limitations. (Tr. 148–50). Thus, however slightly, the ALJ nonetheless mischaracterized Dr. Heilpern's opinion. Furthermore, seemingly contrary to Dr. Heilpern's opinion and the ALJ's accordance of great weight thereto, the ALJ did not opine as to whether Evans's past relevant work includes housekeeping or whether she retained the RFC to perform such work.[17] (Tr. 22). Similarly, Dr. Heilpern opined that Evans could occasionally kneel and crawl; though, the ALJ concluded

---

[17] To be sure, as aforenoted, the ALJ ultimately found that Evans *lacked* the RFC to perform her past relevant work as a hotel inspector. (Tr. 22). Though the hotel inspector occupation also constitutes light work, it remains distinct from the housekeeper occupation. *See* Dictionary of Occupational Titles 321.137-014.

Evans could never kneel or crawl. (*Id.*) Given these incongruities, the manner and extent to which the ALJ heeded Dr. Heilpern's opinion manifests ambiguity.

In any event, given the ALJ failed to articulate good cause to discount Dr. Toma's opinion – and therewith seemingly conflated the evidence vis-à-vis Evans's fibromyalgia and other impairments – the court does not find substantial evidence supports the ALJ's weighing of Dr. Heilpern's opinion. Dr. Heilpern's RFC formulation included a finding that Evans could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk roughly six hours in an eight-hour work day; and sit roughly six hours in an eight-hour work day. (Tr. 148).

As previously elaborated, Evans's treatment records portray that Dr. Toma and Dr. Malik consistently treated Evans's fibromyalgia and left hip bursitis, and Dr. Parish and Dr. Featheringill assessed Evans with hip and shoulder pain. Based upon the ALJ's failure to acknowledge these records vis-à-vis Dr. Toma's opinion, and her apparent misperception of fibromyalgia, the court cannot ascertain whether her assessment of Dr. Heilpern's opinion rests upon substantial evidence. *See Cowart v. Schweiker*, 662 F.2d 731, 735 (11ᵗʰ Cir. 1981) ("Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'") (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4ᵗʰ Cir. 1981)); *Williams v. Saul*, No. 8:18-cv-2402-T-AEP, 2020 U.S. Dist. LEXIS 55988, at *14–15 (M.D. Fla.

Mar. 31, 2020) (the court could not conclude substantial evidence supported the ALJ's decision because the ALJ failed to address medical evidence contrary to her decision); *Tobin v. Acting Comm'r of Soc. Sec. Admin.*, No. 6:18-cv-1426-Orl-MCR, 2019 U.S. Dist. LEXIS 137224, at *17–21 (M.D. Fla. Aug. 14, 2019) (the ALJ erred in according more weight to the non-examining physician's opinion than to the treating physician's opinion because he discounted or ignored relevant evidence); *Burch v. Berryhill*, No. 8:16-cv-3524-T-24AAS, 2018 U.S. Dist. LEXIS 16853, at *17–18 (M.D. Fla. Jan. 16, 2018) (the court could not discern whether substantial evidence supported the ALJ's credibility determination because the ALJ failed to discuss the treating physicians' opinions which, if entitled to considerable weight, could affect such determination), *report and recommendation adopted*, *Burch v. Berryhill*, No. 8:16-cv-3524-T-24AAS, 2018 U.S. Dist. LEXIS 15565 (M.D. Fla. Jan. 31, 2018).

Moreover, Dr. Heilpern's opinion that Evans could perform her past relevant work – or that she could perform a "reduce[d] range of light work," as perhaps construed by the ALJ – invades the province of the ALJ and sustains no dispositive weight.

> According to 20 C.F.R. § 404.1527(d), the determination of whether an individual is disabled is reserved to the Commissioner, and no special significance will be given to an opinion on issues reserved to the Commissioner. Section (d)(2) provides that although the Commissioner will consider opinions from medical sources on issues such as the RFC and the application of vocational factors, the final responsibility for deciding those issues is reserved to the Commissioner.

*Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x. 833, 834 (11th Cir. 2017).  That is, "the task of determining a claimant's . . . ability to work is within the province of the ALJ, not of doctors." *Robinson v. Astrue*, 365 F. App'x. 993, 999 (11th Cir. 2010).  Accordingly, the ALJ erred in according Dr. Heilpern's opinion great weight.  *See id*; *see also Johnson v. Barnhart*, 138 F. App'x. 266, 271 (11th Cir. 2005) ("Dr. Maloy's RFC evaluation is not dispositive, as its conclusions are from a non-treating, non-examining physician, and the other medical records express no indication of [the claimant's] ability to perform her past work.").

Based upon the foregoing discussion, the court does not find substantial evidence buttresses the ALJ's assessment of Dr. Heilpern's opinion.  Upon remand, the ALJ should reassess Dr. Heilpern's opinion in light of the principles and evidence discussed vis-à-vis Dr. Toma's opinion.

## II.   The ALJ Improperly Discredited Evans's Subjective Complaints of Pain

Evans contends the ALJ erroneously discounted her subjective complaints of pain based upon the absence of "objective abnormalities beyond the presence of trigger points and associated fibromyalgia symptoms." (Doc. 10 at 10–11).  In addition, Evans avers the ALJ improperly failed to provide "a cogent reason" for discounting the testimony of her neighbor and mother-in-law.  (*Id.* at 12).  For the reasons discussed below, the court finds merit in Evans's contention that the ALJ evaluated improperly

her subjective complaints of pain.  The court will remand the case to the ALJ to further evaluate her testimony.

Because remand is warranted on this basis, the court will not address Evans's allegations regarding the ALJ's assessment of the third-party testimony.  *See Demenech v. Sec'y of the Dep't of HHS*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (because one issue plaintiff raised warranted remand, the court need not consider the remaining issues); *accord Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Hall v. Astrue*, No. CV-11-S-3540-J, 2012 U.S. Dist. LEXIS 86838, at *12 n.8 (N.D. Ala. June 22, 2012).

> To establish disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)).  A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, and republished October 25, 2017, eliminated the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarified that the ALJ "will consider any personal

observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2017 WL 5180304, *6 (Oct. 25, 2017). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)-(4), 416.929(c)(3)-(4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *10; *see also Wilson*, 284 F.3d at 1225 (if an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

As previously discussed, fibromyalgia often lacks objective medical findings and "is generally diagnosed mostly on a[n] individual's described symptoms." *Moore*, 405 F.3d at 1211. Accordingly, the court may "reverse an ALJ's determination that a fibromyalgia claimant's testimony was incredible where the lack of objective findings provided the basis for the adverse credibility determination." *Horowitz*, 688 F. App'x at 863 (citing *Moore*, 405 F.3d at 1211).

29

Evans testified at the hearing that she suffers from carpal tunnel syndrome in both hands, causing numbness in her wrists, hands, and fingertips.[18] (Tr. 44). Evans stated that "a lot of times" the numbness causes her fingertips to turn blue, and that Dr. Malik advised her to drink half-cups of water from non-glass vessels in the event she loses her grip thereof. (*Id.*) In addition, Evans testified that she avoids wearing buttoned shirts because her wrist numbness interferes with her ability to manipulate buttons. (Tr. 44–45).

Evans further testified that she began taking Lyrica for her fibromyalgia in 2014, and that "[w]hen it's a good day," she "can get up and walk around, [and] [p]ut something in the microwave." (Tr. 45–46). Evans averred she lives with her nephew, who does her laundry and drives her to medical appointments. (Tr. 47, 49). In addition, Evans testified that her neighbors often help with household cleaning and drive her to medical appointments. (Tr. 47, 49). Evans stated she used to care for her young grandson, but that she "can't even do for [her]self now" that which she used to do for him, such as cooking and bathing him. (Tr. 51–52). Evans further stated that she walks with a cane as needed and that her condition has "[m]ost definitely" worsened in the last years. (Tr. 52).

Evans testified that she feels tired and lacks energy daily, which negatively affects her fibromyalgia. (Tr. 56). According to Evans, her fibromyalgia pain becomes so

---

[18] Carpal tunnel syndrome constitutes "a common symptom and associated condition of [fibromyalgia] patients." https://pubmed.ncbi.nlm.nih.gov/12070678/ (last visited June 4, 2020).

intense that she does not want to lie down. (*Id.*) She further averred that the pain affects her entire body, such that she only wants to sit still to prevent anything from touching her body. (Tr. 57). Evans stated that she avoids moving because movement incites "very intense" pain. (*Id.*) In addition, Evans averred that she lies down two to three hours at a time during the day, and that she "might be [awake] for two, three days at a time." (Tr. 58). Evans testified that when she sleeps, she typically gets up around noon and, her pain permitting, tries to wash her face. (Tr. 59). Evans stated she had not taken a bath in four or four and a half years. (*Id.*) She further testified that she watches television for several hours before lying back down again, as she feels "just so exhausted all the time." (Tr. 60).

Finally, Evans testified she experiences persistent lesions on her head and often experiences mouth ulcers. Evans averred that she cannot tolerate sunlight because of her lesions, and that she forgoes family functions to protect her immune system from the risk of flu or pneumonia. (Tr. 61–62).

In her Function Report, Evans stated she cares for her grandchild, but that her impairments preclude her from caring for herself or her grandchild as she once did. (Tr. 263). Evans indicated her impairments affect her ability to dress, bathe, care for her hair, feed herself, use the toilet, walk, bend, and stand. (*Id.*) She further stated that she sometimes requires reminders vis-à-vis taking medication, caring for her personal needs, and grooming. (Tr. 264). Evans averred that her cooking habits have changed since the onset of her impairments; she now spends a few minutes each day preparing

frozen meals.  (*Id.*)  In addition, Evans stated that she does "very little cleaning" and "very little laundry", and that she requires help doing both.  (*Id.*)  Evans stated that she goes only to medical appointments, and cannot go alone due to fatigue and pain.  (Tr. 265).  Similarly, Evans averred that her sister or nephew shops for her.  (*Id.*)

Furthermore, Evans stated that her pain causes her to stay in bed and that she has become withdrawn since the onset of her impairments.  (Tr. 266–67).  Evans indicated that her impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, and use her hands. In addition, Evans stated she could walk only next door, and could not lift a gallon of milk, or, sometimes, a full glass of water.  (Tr. 267).  Evans further averred she cannot walk far before needing to rest for five to ten minutes.  Finally, Evans stated she walked with a prescribed cane as needed.  (Tr. 268).

In her Pain Questionnaire, Evans stated she experiences "full body pain."  (Tr. 325).  She specifically indicated she experiences pain in her hands, right wrist, hip, back, shoulder, head, face, and forearm.  (*Id.*)  Evans averred that standing, walking, heat, cold, and her lupus incite her pain, which persists throughout the day.  (*Id.*)  She further stated that she cannot get out of bed most of the time, and cannot take narcotic pain medications due to their negative side effects.  (*Id.*)  In addition, Evans indicated she walked with a cane and wore wrist braces for her carpal tunnel syndrome.  (Tr. 326). Finally, Evans stated that because of her pain, she cannot stand or walk for long durations, and that someone must accompany her when she goes out.  (*Id.*)

In her opinion, the ALJ summarized Evans's hearing testimony, but did not discuss her Function Report or Pain Questionnaire. (Tr. 20). The ALJ found that Evans's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 19). The ALJ further found, however, that Evans's statements concerning the intensity, persistence, and limiting effects of these symptoms did not fully accord with the medical and other evidence "for the reasons explained in [the] decision." (*Id.*) Aside from the ALJ's assessment of Dr. Toma's and Dr. Heilpern's opinions, the decision proceeds to discuss solely the following evidence: Dr. Malik's September 2016, May 2017, and February 2018 treatment records; Dr. Featheringill's May 2017 and June 2017 treatment records; and Dr. Parish's October 2016 evaluation of Evans. (Tr. 20–22). Substantial evidence fails to support the ALJ's assessment of Evans's subjective complaints of pain.

The ALJ relied upon Dr. Malik's September 2016, May 2017, and February 2018 treatment records to discredit Evans; however, these records depict typical fibromyalgia symptoms and Evans's complaints thereof. *See Rutledge*, 391 F. Supp. 2d at 1062. The ALJ correctly noted that Dr. Malik indicated Evans was "doing ok" in May 2017 and February 2018. However, as the ALJ observed, Dr. Malik noted in September 2016 and May 2017 that Evans "had multiple diffuse tender points present all over with significantly worsening tenderness over her left trochanteric bursa with iliotibial band tightening", and administered her an anti-inflammatory hip injection during both appointments. (Tr. 20, 21). The ALJ similarly acknowledged that Dr. Malik's February

2018 treatment records noted Evans "had multiple diffuse tender points present all over." (Tr. 21). Furthermore, the ALJ noted that Dr. Malik prescribed Evans Lyrica and muscle relaxers during all three appointments. (Tr. 20, 21).

Given that Dr. Malik consistently assessed Evans with multiple tender points, administered her anti-inflammatory hip injections, and prescribed her pain medications, the court fails to discern how Dr. Malik's treatment records undermine Evans's testimony. *Somogy*, 366 F. App'x at 64 ("Other than a lack of objective medical findings, there is nothing in the record to suggest that [the claimant] did not suffer the degree of pain she reported or that her doctors should have disbelieved her complaints. . . . [T]he credibility of [plaintiff's] complaints of disabling pain are bolstered by evidence that she made numerous visits to her doctors over the course of several years, underwent numerous diagnostic tests, and was prescribed numerous medications."); *Rutledge*, 391 F. Supp. 2d at 1062 ("Objective, clinical support for a diagnosis of fibromyalgia may also be present if injections of pain medication to the trigger points are prescribed.").

As for Dr. Featheringill's May 2017 and June 2017 treatment records, the ALJ noted that Evans displayed "point tenderness over the area of the left trochanteric bursa" during both appointments. (Tr. 20, 21). The ALJ then highlighted Dr. Featheringill's other findings:

> On exam, the right shoulder had diffuse tenderness, but there was good external rotation and abduction strength. The left shoulder had better motion. Dr. Featherinfill [sic] noted that some of the decreased range of motion might be due to the claimant's body habitus. His exam found that the     claimant     was     quite     stocky     and     thick     about     the

shoulders. . . [R]otational movement of the hip was normal without any pain.  Straight leg raise testing was negative on the left.  There was good left hip abduction power.  Bilateral shoulder x-rays showed . . . no glenohumeral problem of significant [sic].  The left hip x-rays looked good. . . . [Evans's] left hip magnetic resonance imaging was basically completely normal.

(Tr. 20).

The ALJ did not specify whether she discerned that Dr. Featheringill's evaluation notes undermine Evans's testimony vis-à-vis her fibromyalgia, left hip bursitis, or osteoarthritis of the bilateral shoulders.  However, Dr. Featheringill's treatment notes buttress Evans's complaints of pain as to all three impairments.

Dr. Featheringill's observation of point tenderness on Evans's left hip and diffuse tenderness on her right shoulder supports Evans's complaints of pain arising from her fibromyalgia and left hip bursitis.  And because "fibromyalgia patients 'manifest normal muscle strength and neurological reactions[,] and have a full range of motion'", Evans's normal rotation and abduction strength does not undermine this conclusion.  *Rogers*, 486 F.3d at 244 (quoting *Preston*, 854 F.2d at 820); *see also Moore*, 405 F.3d at 1211; *Steiner*, 2017 U.S. Dist. LEXIS 138142, at *24.  Similarly, "x-ray scans are meaningless in fibromyalgia cases," *Reliford*, 444 F. Supp. 2d at 1190, and cannot "positively establish the diagnosis of bursitis."  *Bursitis*, MAYOCLINIC.COM, https://www.mayoclinic.org/diseases-conditions/bursitis/diagnosis-treatment/drc-20353247#:~:text=X%2Dray%20images%20can't,Lab%20tests. (last visited June 12, 2020).  Thus, the normality portrayed in Evan's left hip x-ray bears no relevance to her

complaints of pain vis-à-vis fibromyalgia and left hip bursitis.  To be sure, Dr. Featheringill assessed Evans with left hip bursitis.

Finally, as for Evans's osteoarthritis of the bilateral shoulders, Dr. Featheringill diagnosed Evans with bursitis of both shoulders despite her "good external rotation and abduction strength."[19]  (Tr. 676).  Accordingly, substantial evidence fails to buttress the ALJ's assessment that Dr. Featheringill's records undermine Evans's subjective complaints of pain.

The ALJ's assessment of Dr. Parish's evaluation remains likewise improper.  The ALJ observed that Dr. Parish located various tender areas and trigger points throughout Evans's body, which accords with her fibromyalgia-related complaints.  (Tr. 21).  The ALJ further noted that Evans's

> [c]oordination and cranial nerve exams were normal.  There was no loss of muscle tone or muscle wasting present.  Reflexes were normal throughout.  Muscle power was 5/5 throughout.  Sensation was intact. Straight leg raise testing was negative.  [Evans] had midline and paravertebral tenderness throughout the spine.  She had some sacroiliac joint tenderness on the left.  Range of motion was decreased in all planes of the dorsolumbar spine.  [Evans] also had decreased range of motion on flexion of the left hip and abduction . . . and forward elevation of the bilateral shoulders.   Otherwise, range of motion was normal throughout. . . . X-rays of the left hip were normal.

(Tr. 21).

---

[19] As aforenoted, bursitis and fibromyalgia may arise concomitantly.  *See* https://www.news-medical.net/health/Fibromyalgia-with-Bursitis.aspx#:~:text=Fibromyalgia%20is%20a%20condition%20that,be%20confused%20for%20one%20another. (last visited June 8, 2020).

To recount, fibromyalgia patients retain normal muscle strength and manifest normal x-ray findings. X-rays likewise do not reveal indicators of bursitis. Accordingly, Evans's normal muscle power and left hip x-ray fail to undermine her complaints of pain vis-à-vis fibromyalgia and left hip bursitis. Indeed, Dr. Parish assessed Evans with chronic left hip pain and "[t]otal body fibromyalgia." (Tr. 463). Furthermore, Dr. Parish indicated that Evans's shoulders exhibited reduced abduction and elevation, and diagnosed her with chronic bilateral shoulder pain. Dr. Parish's records thus bolster Evans's complaints of pain arising from her osteoarthritis of the bilateral shoulders.

Moreover, as elaborated previously, Dr. Parish recorded Evans's limitations vis-à-vis her daily living activities and noted that she requires her family's assistance therewith. Dr. Parish's notes parallel, and therefore bolster, Evans's testimony as to the same. Dr. Parish's evaluation notes thus fail to buttress the ALJ's discrediting Evans's testimony with substantial evidence.

Finally, as previously discussed, Dr. Toma consistently documented Evans's complaints of pain, (tr. 94, 608, 628, 634), administered her anti-inflammatory hip injections, (tr. 610, 628, 636), and prescribed her pain medication. (Tr. 610, 637). Dr. Toma's treatment records thus further undermine the ALJ's discrediting of Evans's testimony, as they portray her complaints and treatment for pain arising from fibromyalgia and left hip bursitis.

In sum, the treatment records the ALJ relied upon in discrediting Evans's testimony portray that she received anti-inflammatory injections, took prescription pain

medications, and displayed tenderness or trigger points consistent with fibromyalgia and left hip bursitis.  Dr. Featheringill's and Dr. Parish's records further buttress Evans's testimony regarding pain arising from her impairments, including osteoarthritis of the bilateral shoulders.  The ALJ's assessment of Evans's subjective complaints of pain thus lacks support in substantial evidence.

## CONCLUSION

For the foregoing reasons, the court **REVERSES** the Commissioner's decision and **REMANDS** the case for further consideration of the medical opinion evidence and Evans's subjective complaints of pain.[20]

The court **GRANTS** Evans an extension of time in which to file a petition for authorization of attorney's fees pursuant to 42 U.S.C. § 406(b) until the later of:

---

[20] Evans beseeches the court to award her attorney's fees pursuant to 28 U.S.C. § 2412(d).  (Doc. 13 at 10).  Section 2412(d)(1)(B) provides:

> A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed. The party shall also allege that the position of the United States was not substantially justified.

§ 2412(d)(1)(B).  Evans does not specify the amount sought, the time expended, or the computation of rates pursuant to § 2412(d)(1)(B).  The court thus denies Evans's request without prejudice.  *See id.* Evans may renew her application for attorney's fees pursuant to the procedures set forth in § 2412(d)(1)(B).

In addition, Evans beseeches the court to "extend the time frame specified in [Federal Rule of Civil Procedure] 54(d)(2)(B) in which [she] may file an application for 42 U.S.C.A. § 406(b) attorney's fees so as to allow the Commissioner to calculate [her] past-due benefits."  (Doc. 13 at 10).  Section 406(b) provides:

1) **THIRTY (30) DAYS** subsequent to the resolution of the request by Evans's attorney to the Social Security Administration for authorization to charge a fee for proceedings before the Commissioner; or

---

> Whenever a court renders a judgment favorable to a [social security] claimant . . . who was represented before the court by an attorney, the court may determine and allow as part of its judgment a reasonable fee for such representation, not in excess of 25 percent of the total of the past-due benefits to which the claimant is entitled by reason of such judgment.

§ 406(b).  Furthermore, pursuant to Federal Rule of Civil Procedure 54(d)(2)(B)(i), "[a] claim for attorney's fees and related nontaxable expenses must be made by motion . . . no later than 14 days after the entry of judgment."  Fed. R. Civ. P. 54(d)(2)(B)(i).  Rule 54(d)(2)(B)'s fourteen-day filing period governs motions for attorney's fees under § 406(b).  *See Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1277 ("Fed. R. Civ. P. 54(d)(2) applies to a § 406(b) attorney's fee claim.").

As the Commissioner has yet to determine that it owes Evans past-due benefits, and may not do so before the Rule 54(d)(2)(B) fourteen-day filing period elapses, the court extends Evans's time to move for § 406(b) attorney fees to the later of:

> 1) **THIRTY (30) DAYS** subsequent to the resolution of the request by Evans's attorney to the Social Security Administration for authorization to charge a fee for proceedings before the Commissioner; or

> 2) **THIRTY (30) DAYS** subsequent to receipt by Evans's attorney of the closeout letter required under the Program Operations Manual System GN 03930.91.

*See id.* n.2 ("[T]he claimants could have avoided the confusion about integrating [Rule] 54(d)(2)(B) into the procedural framework of a fee award under 42 U.S.C. § 406(b) by moving the district court for an extension of the 14 day period described in [Rule] 54(d)(2)(B) when the district court remanded their case."); *Mercer v. Comm'r of Soc. Sec. Admin.*, No. 2:17-cv-02158-JHE, 2019 U.S. Dist. LEXIS 53539, at *26–27 (N.D. Ala. Mar. 29, 2019) (the court extended the Rule 54(d)(2)(B) filing deadline upon remanding the case to the Commissioner); *accord Chancy v. Berryhill*, No. 6:16-cv-00735-JEO, 2018 U.S. Dist. LEXIS 8005, at *52–53 (N.D. Ala. Jan. 18, 2018); *Hill v. Berryhill*, No. 5:16-CV-597-VEH, 2017 U.S. Dist. LEXIS 122329, at *23–24 (N.D. Ala. Aug. 3, 2017).

2) **THIRTY (30) DAYS** subsequent to receipt by Evans's attorney of the closeout letter required under the Program Operations Manual System GN 03930.91.

**DONE** this 17th day of June, 2020.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE